UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND CONTROLS, INC., <br><br> Plaintiff, <br><br> v. <br><br> JOSEPH PILSBURY, <br><br> Defendant. | Civil Action No. 18-cv-10583-DJC |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                                                          June 27, 2018

**I. Introduction**

Plaintiff New England Controls, Inc. ("NEC") moves for a preliminary injunction against Defendant Joseph Pilsbury ("Pilsbury"), a former employee of POND Technical Sales, Inc. ("POND"), NEC's wholly-owned subsidiary. D. 9 at 1. NEC seeks to enjoin Pilsbury from soliciting NEC customers on behalf of a direct competitor and disclosing NEC's confidential business information in violation of his non-solicitation and nondisclosure agreements with NEC. D. 10 at 5. Pilsbury has also moved the Court to order that NEC disclose all alleged confidential information relevant to the case. D. 19. For the reasons discussed below, NEC's motion for preliminary injunction, D. 9, is ALLOWED. Pilsbury's motion for disclosure, D. 19, is DENIED.

**II. Standard of Review**

To obtain a preliminary injunction, the Court must consider: (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest. Corp. Techs.,

Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013). NEC "bears the burden of establishing that these four factors weigh in its favor." Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006).

### III. Factual Background

Pilsbury, a Maine resident, began working for POND as an outside sales engineer in 2003. D. 16 ¶¶ 1, 5. POND, a Connecticut company, was acquired by NEC, a corporation based in Massachusetts, in 2008. D. 10-1 ¶ 5; D. 16 ¶ 14. In January 2018, Pilsbury resigned from POND and began working for TriNova, Inc. ("TriNova"). D. 10-1 ¶¶ 17-18.

According to the affidavit provided by Thomas Ramundo, NEC's president, NEC is a company that "provides process control equipment and related services for the life sciences, gas distribution and transmission, power, food and beverage, pulp and paper, water and wastewater and chemical industries," including valve packages, among other instruments. D. 10-1 ¶¶ 2, 4. "POND is a sales organization for certain products and services." D. 10-1 ¶ 5. Since NEC acquired POND, the two have "operate[d] as affiliates," and their sales teams "work collaboratively." D. 10-1 ¶¶ 5-6. TriNova, an Alabama company that "has recently expanded into New England," "offers valves and instruments in competition with NEC." D. 10-1 ¶ 7.

Pilsbury describes NEC/POND and TriNova as "independent manufacturer representative[s] that specialize[] in technical engineered equipment." D. 16 ¶ 6. Each company serves as certain manufacturers' exclusive "sales and service agent" in specific geographic regions. Id. In New England, NEC holds this relationship with the manufacturer Emerson. D. 16 ¶ 8. In December 2017, TriNova established an exclusive relationship with the manufacturer Endress & Hauser ("E&H"), replacing E&H's prior designated representative. D. 16 ¶ 9. Emerson and E&H are competitors "and have been for over 25 years." D. 16 ¶ 8. Although manufacturers and

2

designated representatives maintain exclusive relationships with each other, customers do not maintain exclusive relationships with either. D. 16 ¶ 10. Typically, a "customer solicits a proposal on a solution to solve a problem" from manufacturers, who contract directly with customers and pay commissions to representative companies like NEC/POND and TriNova. D. 16 ¶¶ 11, 7.

When Pilsbury began working for POND in 2003, he was an account manager who worked "with specific identified customers" in Maine and New Hampshire selling Emerson products. D. 16 ¶ 13. In 2013, he was promoted to Field Sales Manager and in 2014 his title changed to "Measure and Analyze Business Development Manager." D. 16 ¶¶ 15-16; see D. 10-1 ¶ 8. In this role, Pilsbury "had technical and commercial leadership responsibility for all of POND's measure and analyze products and services." D. 10-1 ¶ 8. Pilsbury continued covering his designated accounts and traveled with and coached other account managers. D. 16 ¶ 17.

According to Ramundo, Pilsbury's tenure at POND exposed him to such confidential NEC/POND information as "the [c]ompanies' compilation of information about customers, including those accounts [Pilsbury] did not personally represent, through the SalesLogix customer relations management database," including customers' contact information, product and service needs, purchasing protocols and procedures, transactional and negotiation history and pricing information, as well as NEC/POND's "unique sales and marketing techniques and strategies." D. 10-1 ¶ 10. Pilsbury contends, however, that "NEC has no confidential pricing and marketing strategy information" because "[p]ricing is set by each manufacturer, not by the retailer," and pricing information is given to all new POND employees when they start and is available on the internet. D. 16 ¶¶ 30-31, 42(c); D. 26-1. He states that the "client identities of various competitors in the industry are well known to each other" and often voluntarily disclosed. D. 16 ¶¶ 33, 42(a). According to Pilsbury, the SalesLogix platform was not used to track account plans or pricing

strategy, which were instead maintained by account managers on their own computers. D. 16 ¶ 34. Pilsbury's use of the database involved "review[ing] a weekly printed spreadsheet downloaded from SalesLogix by POND's receptionist which contained new opportunities," to which Pilsbury added information he had about those opportunities and returned it to the receptionist, who added his contributions to the database. D. 16 ¶ 37. Pilsbury used other software applications to store customer information, and when he resigned, he was not asked to turn over his login information for these accounts. D. 16 ¶¶ 41, 42(b). He also states that many NEC/POND employees with access to the SalesLogix database do not have non-solicitation agreements. D. 16 ¶ 36.

On December 19, 2017, approximately two months after E&H announced that TriNova would be its new designated representative, Pilsbury notified Ramundo that he "wanted to explore opportunities with TriNova." D. 16 ¶¶ 20, 22. Ramundo asked Pilsbury if he "was going to attempt to sell TriNova's products to POND/NEC's customers," and Pilsbury responded that he "did not see how such overlap was avoidable." D. 16 ¶ 22. Pilsbury also expressed his intentions to his direct supervisor, Robert Osnoe, who warned of legal action based upon Pilsbury's non-solicitation agreement with NEC. D. 16 ¶ 23. Two days later, Ramundo contacted Pilsbury to warn that he would "enforce the non-solicitation agreement." D. 16 ¶ 24.

On January 11, 2018, Pilsbury accepted an offer from TriNova as an account manager for key accounts and the general territory of eastern New England and tendered his resignation to Osnoe. D. 16 ¶ 25. One week later, Pilsbury returned the "company property in [his] possession," including his laptop, tablet, smartphone and other office supplies. D. 16 ¶¶ 26, 28. NEC alleges that these devices had been "wiped" when he returned them. Compl. ¶ 29.[1]

---

[1] The complaint filed in Suffolk Superior Court, filed as Document 18 at 4-12, is referred to herein as "Compl."

Pilsbury has held his position at TriNova since January 15, 2018. D. 16 ¶ 48. He contends that "[t]he majority of customers that TriNova works with today, and with whom [he is] working, were existing E&H customers prior to [his] joining TriNova." D. 16 ¶ 9. Pilsbury states that his compensation at TriNova is partially dependent upon commission. D. 16 ¶ 45. He anticipates that an injunction would require him to "move to the Southern territory of TriNova for the remainder of the injunction period," which would also require relocation of his wife, two children and his wife's parents for whom he provides care. D. 16 ¶¶ 45-46.

### A. The Nondisclosure and Non-Solicitation Agreements and Alleged Breaches

After NEC acquired POND, Pilsbury entered into two agreements relevant here. First, on November 22, 2010, in consideration of continued employment, Pilsbury signed the "Employee Agreement concerning Non-Disclosure & Intellectual Property" (the "Nondisclosure Agreement"). D. 10-1 ¶ 16, at 16-20. In the agreement, expressly governed by Massachusetts law, Pilsbury agreed that upon termination of employment, he would "not at any time directly or indirectly, use (for [him]self or another), disclose or make accessible to anyone any Confidential Information, except as expressly permitted by NEC or as required by law." D. 10-1 at 18. The agreement defines "Confidential Information" to include, *inter alia*, "the names and contact information of actual and potential customers of the NEC," "marketing techniques or plans" and "pricing policies." D. 10-1 at 17. The agreement does not contain terms limiting the duration of the agreement's applicability. See D. 10-1 at 17-20.

Second, between 2013 and 2016, Pilsbury was awarded twenty shares of NEC Phantom Stock conditioned upon Pilsbury's signing the Invention, Non-Disclosure and Non-Solicitation Agreement ("the Non-Solicitation Agreement"). D. 10-1 ¶ 14, at 13-15. This agreement, governed by Massachusetts law, D. 10-1 at 15, includes the following provision:

> Non-Solicitation of the Company Clients. I covenant and agree that while I am an employee of the Company and for a period of twenty-four (24) months thereafter (the "Restrictive Covenant Period"), I will not, whether for my own account or for any other person or organization, call upon, solicit, divert, attempt to solicit or divert, any persons or entities known by me to be former Clients or current Clients of the Company (including for this purpose only those former Clients who were Clients during the last twelve (12) months of my employment with the Company), with respect to providing products or services that compete with products and services offered by the Company, nor, during the Restrictive Covenant Period, shall I, directly or indirectly, whether for my own account or for any other person or organization, provide any such products or services to any such person or entity.

D. 10-1 at 14.

At some point after Pilsbury started working for TriNova, NEC learned that one of its customers, BioPharm Engineered Solutions ("BioPharm"), had received a brochure from TriNova listing Pilsbury as the territory manager to contact. D. 10-1 ¶ 20. Pilsbury contends that BioPharm began purchasing E&H products from TriNova's predecessor "long before" TriNova hired him. D. 16 ¶ 48. Pilsbury participated in a meeting with BioPharm and TriNova on January 17, 2018, which was arranged prior to his employment with TriNova, where he "did not disclose, rely on, or use in anyway [sic] any of POND's confidential information." Id. He was not responsible for the BioPharm account while working at POND/NEC with the exception of one month in 2007 when he covered for the account's regular sales representative. D. 16 ¶ 49.

Two days after the BioPharm meeting, Pilsbury met with the purchasing manager of Zajac, LLC ("Zajac") and discussed his new position at TriNova. D. 16 ¶¶ 51-52; see D. 10-2 ¶ 6. Zajac is a customer of E&H products through TriNova and of Emerson components through NEC/POND. D. 10-2 ¶¶ 3, 7; D. 16 ¶ 51. Pilsbury represented NEC/POND in their business with Zajac and developed a relationship with Zajac's purchasing manager. D. 10-2 ¶ 4. Pilsbury had access to "nonpublic information relevant to doing business with Zajac," such as Zajac's contact information, product needs, purchasing protocols, pricing and negotiation history. D. 10-2 ¶ 5.

NEC contends that Pilsbury's conduct demonstrates that he has already used and may continue to use confidential information regarding these customer relationships. D. 10 at 6, 9.

IV.  **Procedural History**

NEC filed a motion for preliminary injunction and complaint in Suffolk County Superior Court on March 7, 2018. D. 1-3; D. 18 at 11. Pilsbury removed the action to this Court. D. 1. On April 9, 2018, NEC filed a motion for preliminary injunction. D. 9. On April 18, 2018, Pilsbury filed a motion seeking that NEC identify "all alleged trade secrets and confidential information at issue in this action." D. 19. On May 14, 2018, the Court heard the parties on the pending motions. D. 27.

V.  **Discussion**

    A.  **Likelihood of Success on the Merits**

"The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002); see Boathouse Grp., Inc. v. TigerLogic Corp., 777 F. Supp. 2d 243, 248 (D. Mass. 2011) (explaining that "[l]ikelihood of success on the merits is the critical factor in the analysis and, accordingly, a strong likelihood of success may overcome a 'somewhat less' showing of another element" (quoting EEOC v. Astra U.S.A., Inc., 94 F.3d 738, 743 (1st Cir. 1996))).

NEC argues that it has demonstrated a likelihood of success on its breach of contract claim. D. 10 at 12. NEC alleges that Pilsbury has breached the Nondisclosure Agreement and Non-Solicitation Agreement. Compl. ¶¶ 36-37. Breach of contract requires a plaintiff to demonstrate "that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiff sustained damages as a result of the breach." Young v. Wells Fargo Bank., N.A., 828 F.3d 26, 32 (1st Cir. 2016) (quoting Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 232 (1st Cir.

2013)). Under Massachusetts law, a covenant not to compete—including a non-solicitation or nondisclosure agreement—is enforceable "only if it is necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest." Boulanger v. Dunkin' Donuts, Inc., 442 Mass. 635, 639 (2004); see All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974). The employer bears the burden of proving that the agreement protects legitimate business interests. ABM Indus. Grps., LLC v. Palmarozzo, 34 Mass. L. Rptr. 217, 2017 WL 2292744, at *2 (Mass. Super. Ct. Mar. 30, 2017); see New England Canteen Serv., Inc. v. Ashley, 372 Mass. 671, 675 (1977). Legitimate business interests include protecting an employer's confidential information and good will. Boulanger, 442 Mass. at 641. "A covenant not to compete designed to protect a party from ordinary competition does not protect a legitimate business interest." Id.

Because NEC seeks a preliminary injunction arguing that it has shown a reasonable likelihood of success on its breach of contract claim as to both agreements, D. 10 at 12, the Court addresses each agreement in turn.

### 1. The Nondisclosure Agreement

NEC contends that Pilsbury has "disclosed nonpublic customer information" to TriNova in violation of his Nondisclosure Agreement and seeks injunctive relief preventing further violations. D. 9 at 1. Pilsbury responds that the information in question—customer contact information—is not confidential, and that even if it is confidential as a general matter, NEC has not carried its burden to show that Pilsbury breached the agreement.[2] D. 15 at 14-22.

---

[2] Pilsbury does not argue that the Nondisclosure Agreement is unreasonable in scope, cf. D. 15 at 12-13 (referencing only Non-Solicitation Agreement).

Pilsbury first argues that NEC fails to specify what allegedly confidential information is at issue, D. 15 at 14-15, 17, and, in fact, moves the Court to order NEC to provide "a complete[,] detailed and specific list identifying all alleged trade secrets and confidential information at issue in this action," D. 19. The Court does not agree, however, with Pilsbury's contention that NEC has failed to identify the confidential information at issue, see D. 19 ¶ 1. To the extent NEC's reference in the motion for preliminary injunction to "confidential information" is vague, see D. 9 at 2, NEC's complaint and memorandum of law clarify the position by specifying that Pilsbury's breach is due to disclosure of "the names and contact information of NEC's customers," Compl. ¶ 37; D. 10 at 14; see D. 9 at 1. NEC's reply memorandum discusses the confidentiality of NEC's pricing information and other notes kept in the SalesLogix database, D. 20 at 19-22, but NEC has not alleged that Pilsbury disclosed any pricing information, cf. Compl. ¶ 37; D. 10 at 14. Given that NEC's allegations that Pilsbury breached the Nondisclosure Agreement identify only "the names and contact information of NEC's customers" as the confidential information at issue, Compl. ¶ 38, the Court focuses upon same. To the extent the Court would consider issuing such an order that NEC disclose the confidential information at issue now, before initial disclosures or the normal course of disclosure under Fed. R. Civ. P. 26, the Court sees no reason to do so here now, where NEC has specified the category of information at issue: the names and contact information of customers, Compl. ¶ 37; D. 10 at 14. For these reasons, the Court DENIES Pilsbury's motion for disclosure of confidential information, D. 19.

Pilsbury argues that the names and contact information of NEC's customers is not confidential information. D. 15 at 14-21. Whether a given set of business information is secret "depends on the conduct of the parties and the nature of the information," Jet Spray Cooler, Inc.

v. Crampton, 361 Mass. 835, 840 (1972), and there are six factors Massachusetts courts use to determine whether information is confidential:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Id.; see Rohm & Hass Elec. Materials, LLC v. Elec. Circuits Supplies, Inc., 759 F. Supp. 2d 110, 124-25 (D. Mass. 2010). NEC must show that Pilsbury had access to information that "was in fact confidential, as opposed to something that is routinely shared with customers." NetScout Sys. v. Hohenstein, 34 Mass. L. Rptr. 153, 2017 WL 1654852, at *3 (Mass. Super. Ct. Feb. 23, 2017). "[I]nformation is not confidential if competitors could get the same information from public sources or from the third party itself." Corp. Techs., Inc. v. Harnett, 943 F. Supp. 2d 233, 240 (D. Mass. 2013). NEC has not demonstrated that the customer names and contact information in question is information that is or was inaccessible to persons within and outside of NEC and not, as Pilsbury argues, available through third parties and on public platforms such as customers' websites, D. 15 at 19-20; D. 26-1. NEC does not dispute the availability of this information, but rather argues that the fact that this information could be obtained through public sources does not defeat its confidentiality, which is protectable because of the "collection, compilation, and maintenance of this information in an access-limited database." D. 20 at 21. NEC bears the burden to demonstrate likelihood of success, however, Esso Standard Oil, 445 F.3d at 18, and it has failed to make such a showing as to this specific category of information.

Moreover, even if such information were confidential, NEC has not demonstrated that Pilsbury has breached or is likely to breach the agreement by disclosing any of this information

here. NEC contends that "[l]ogic dictates that . . . he has also disclosed nonpublic customer information, including customer contacts, to TriNova." D. 9 at 1. Pilsbury states, however, that the two customers identified by NEC—Zajac and BioPharm—were already TriNova customers prior to his employment there. D. 16 ¶¶ 48, 51. Indeed, Pilsbury's meeting with BioPharm was planned while Pilsbury was still employed at NEC. D. 16 ¶ 48. Although Pilsbury may know which individual to contact at Zajac and how to do so as a result of his tenure at NEC, it does not appear that this information was ever unknown to TriNova.

Thus, NEC has failed to demonstrate a likelihood of success on the merits of its breach of contract claim as to the Nondisclosure Agreement.

### 2. *The Non-Solicitation Agreement*

NEC also seeks a preliminary injunction to enforce Pilsbury's Non-Solicitation Agreement. D. 9 at 1; D. 10 at 12. The Non-Solicitation provides that Pilsbury may not "call upon, solicit, divert, attempt to solicit or divert, any persons or entities known by [him] to be former Clients or current Clients of the Company" for a period of twenty-four months following termination of his employment with NEC. D. 10-1 ¶ 15. In consideration of the agreement, Pilsbury received shares in NEC stock. D. 10-1 ¶ 14, at 13.

NEC argues that the Non-Solicitation Agreement is "necessary to protect NEC's customer goodwill" because the industry "is highly competitive and NEC's success is dependent on the development and maintenance of good customer relationships in order to generate repeat business." D. 10 at 13. Pilsbury contends, however, that he "is not in a position to jeopardize POND's goodwill" because "[m]ost if not all of the POND customers with which Mr. Pilsbury is working at TriNova were already TriNova customers or customers of the E+H line." D. 15 at 24. "In the employment context, restrictive covenants are meant to afford the original employer bargained-for protection of its accrued good will." Corp. Techs., 731 F.3d at 11. "Good will

generally applies to customer relationships," and "[t]hus, salesmen or sales managers have the capacity to injury the good will of their former employers." Kroeger v. Stop & Shop Cos., 13 Mass. App. Ct. 310, 316 (1982). A former employee may be in a position to harm the employer's goodwill "because the former employee's close association with the employer's customers may cause those customers to associate the former employee, and not the employer, with products of the type sold to the customer through the efforts of the former employee." All Stainless, 364 Mass. at 779-80. Here, Pilsbury worked in a sales position at NEC for fifteen years prior to his departure and took a position with an employer newly entering the market in this region, in which he will be working with many of the same customers. See D. 10-1 ¶ 7; D. 16 ¶¶ 22-23. The nature of the industry involves such closely competing products and such an overlapping customer base that Pilsbury told NEC prior to his departure that he expected to engage with NEC's customers in his new position. See D. 16 ¶ 22; cf. Iso Claims Partners, Inc. v. Cassavoy, 2017 WL 2233502, at *6 (Mass. Super. Ct. Mar. 20, 2017) (explaining that where both companies' products and programs were "distinct," a noncompete did not appear necessary to prevent injury to the former employer's goodwill). NEC has, therefore, demonstrated a likelihood to prevail on its assertion that the Non-Solicitation Agreement is a valid and enforceable restrictive covenant based upon goodwill.

NEC also makes brief references to Pilsbury's use of "confidential information" in breach of his Non-Solicitation Agreement. D. 10 at 14. Protection of confidential information is a legitimate business interest that may justify a non-solicitation agreement. See All Stainless, 364 Mass. at 779-80. Again, Pilsbury disputes his access to any truly confidential information. D. 15 at 14-21. "[H]istorical and contemplated price quotes, clients' stated and anticipated future needs, and lists of potential clients," however, may constitute confidential information that the Non-Disclosure Agreement seeks to protect. See Corp. Techs., 943 F. Supp. 3d at 240. NEC argues

that Pilsbury had access to this information through the documents he maintained as to his clients and the SalesLogix database, to which he had access. D. 20 at 7-8. Pilsbury argues that he did not access any nonpublic information for BioPharm, and that his information relevant to Zajac is not "valuable to TriNova" because they sell different products. D. 15 at 18-19. The use of the SalesLogix database Pilsbury describes, however, illustrates his potential exposure to confidential information for customers that he did not personally handle. Moreover, even though E&H and Emerson may contract with the same customers contemporaneously, Pilsbury concedes that the two manufacturers are competitors and have been for decades. See D. 16 ¶ 8. Pilsbury's subjective qualification of this confidential data as "not valuable," D. 26 ¶ 7; see D. 15 at 18-19, does not render it non-confidential. The Court is persuaded that NEC has demonstrated a reasonable likelihood that the Non-Solicitation Agreement is reasonable drawn and enforceable.

NEC has also shown that it is likely that Pilsbury has breached the Non-Solicitation Agreement. "The line between solicitation and acceptance of business is a hazy one" that requires that the Court consider all of the facts. Corp. Techs., 731 F.3d at 10. Although Pilsbury contends that his new connection with BioPharm will not divert sales from NEC, D. 16 ¶¶ 10, 48, 51; D. 26 ¶ 4 (explaining that NEC's exhibit pertaining to BioPharm account relates to NEC valve sales, and TriNova "does very little business in valve sales"), the language of the agreement is not so limited. The agreement's language is broad, barring not only Pilsbury's solicitation of NEC's current and former customers, but also barring Pilsbury's "call[ing] upon" them. See D. 10-1 ¶ 15, at 14. Pilsbury's meetings with BioPharm and Zajac fall squarely within this category of activity from which he agreed to refrain in his Non-Solicitation Agreement. Consequently, even if TriNova had a prior relationship with Zajac and BioPharm, NEC has demonstrated with a reasonable likelihood

that Pilsbury's prior role at NEC and his Non-Solicitation Agreement restrict his interaction with these customers in his current position with TriNova.

Pilsbury also argues that the Non-Solicitation Agreement is temporally unreasonable and overbroad. D. 15 at 11-13. Non-Solicitation Agreements are enforceable if reasonably limited in scope "in terms of the activities they restrict, the geographic limitations they impose on those activities, and the length of time they are in effect." NetScout Sys., 2017 WL 1654852, at *3. "In determining whether a restriction as to time is reasonable, we must consider the nature of the plaintiff's business and the character of the employment involved, as well as the situation of the parties, the necessity of the restriction for the protection of the employer's business and the right of the employee to work and earn a livelihood." Richmond Bros., Inc. v. Westinghouse Broad. Co., 357 Mass. 106, 110 (1970). NEC argues that its twenty-four month restrictive covenant, limited to the New England region, is reasonable under Massachusetts law. D. 10 at 13 (citing Boulanger, 442 Mass. at 643; Marine Contractors Co. v. Hurley, 365 Mass. 280, 290 (1974)). Considering that the agreement is a non-solicitation agreement and not a noncompete, along with the length of Pilsbury's tenure at NEC and his role in sales during that time, the Court is not persuaded that the scope or duration of the agreement is unreasonable.

NEC has, therefore, demonstrated a likelihood of success on the merits of its breach of contract claim as to the Non-Solicitation Agreement.

### B.     Irreparable Harm

To obtain a preliminary injunction, NEC must show a "significant risk of irreparable harm if the injunction is withheld," Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2002), that "cannot be adequately remedied through money damages alone," Corp. Techs., 943 F. Supp. 3d at 242. NEC "need not demonstrate that the denial of injunctive relief will be fatal to its

business," as long as it can demonstrate a "substantial injury that is not accurately measurable or adequately compensable by money damages." Ross-Simons of Warwick, Inc. v. Baccarat, 102 F.3d 12, 18 (1st Cir. 1996). To analyze whether NEC made this showing, the Court will consider certain "guideposts," such as whether its showing "possess[es] some substance" and is not "tenuous or overly speculative" and weighing the predicted harm "in tandem" with likelihood of success. Id. at 19. Solicitation and disclosure often lead to damage that it "would be practically impossible to calculate." Corp. Techs, 943 F. Supp. 2d at 243; see Rohm & Haas, 759 F. Supp. 2d at 126. A claim that NEC's goodwill has been or will be lost, however, does not automatically demonstrate irreparable harm. See Ikon Office Sols., Inc. v. Belanger, 59 F. Supp. 2d 125, 132 (D. Mass. 1999) (finding the loss of customer goodwill not necessarily irreparable and an adequate remedy at law because the "loss of revenue is calculable through evidence of past earnings on the accounts and, if necessary, through the use of expert testimony").

Pilsbury argues that NEC has not established irreparable harm because money damages would adequately redress any harm NEC might suffer.[3] D. 15 at 10; see Packaging Indus. Grp. v. Cheney, 380 Mass. 609, 621 (1980). Pilsbury's threat to NEC's goodwill and confidential information, however, particularly given how small the industry market is in this region, see D. 16

---

[3] Pilsbury also argues that NEC's "excessive delay in seeking injunctive relief" demonstrates that it has not suffered irreparable harm. D. 15 at 9. Even if this were a basis for denying NEC's preliminary injunction—a position the Court does not adopt here—NEC did not act with any undue delay. Pilsbury faults NEC for "wait[ing] 56 days to file for an injunction in state court" after receiving his resignation letter. D. 15 at 9. To the extent that this delay would ever qualify as "excessive," it does not appear excessive or unexplained here. Cf. Alexander & Alexander, Inc. v. Danahy, 21 Mass. App. Ct. 488, 494-95 (1986) (stating that "[u]nexplained delay . . . may indicate an absence of irreparable harm"). First, NEC correctly points out that any relevant time accrual properly commences with NEC's learning of Pilsbury's contact with NEC customers in his new position. NEC sent Pilsbury a cease and desist letter on January 31, 2018. D. 20-1 ¶¶ 6-7. Especially given NEC's efforts to resolve the dispute without litigation during this time, the Court does not find that NEC's filing timeline demonstrates an absence of irreparable harm.

¶¶ 6, 8, does not appear to be readily quantifiable. See Optos, Inc. v. Topcon Med. Sys., 777 F. Supp. 2d 217, 241 (D. Mass. 2011) (emphasizing the harm the former employee could cause in the "limited market" in which the employers participated). Indeed, the fact that Pilsbury met with Zajac—his own former client at NEC—so quickly after his start with TriNova illustrates the potential harm NEC may suffer through loss of goodwill and disclosure of confidential information. See Corp. Techs., 943 F. Supp. 2d at 243 (explaining that the former employee's inevitable disclosure of confidential information and ongoing breaches of a non-solicitation agreement constitute irreparable harm); see, e.g., D. 31 at 2.

NEC has made a sufficient showing that Pilsbury's activity on behalf of TriNova will cause it to suffer irreparable harm.

### C. The Balance of Harms and the Public Interest

For the reasons discussed above, the NEC has demonstrated that it will face unquantifiable harm absent an injunction here. Pilsbury argues that a court order enforcing the restrictive covenants as broadly as NEC seeks would essentially prohibit Pilsbury's continued employment at TriNova. D. 15 at 28-29. According to Pilsbury, prohibiting his activity connected to NEC customers in the region would not reasonably allow him to retain his position at TriNova without relocating "to an entirely new location." D. 16 ¶¶ 45-46. That is, Pilsbury argues that the Non-Solicitation agreement is, in essence, a noncompete. Pilsbury has not, however, submitted any factual evidence to suggest that there is no role for Pilsbury at TriNova that would not require his breach of his Non-Solicitation Agreement. TriNova and NEC's customer base may substantially overlap, but Pilsbury is not barred from working in this industry or working for TriNova. Pilsbury may remain employed with TriNova; he simply cannot solicit or "call upon" NEC's current or former customers during the twenty-four month period following his change of employment.

Finally, a preliminary injunction is not appropriate unless there is "a fit (or lack of friction) between the injunction and the public interest." Nieves-Márquez, 353 F.3d at 120. It is generally in the public interest to "enforce agreements voluntarily entered into and accepted," Shipley Co. v. Kozlowski, 962 F. Supp. 28, 30 (D. Mass. 1996), and "as a matter of long-standing Massachusetts law, it is 'beneficial to the public that contracts for the partial restraint of trade should be upheld to a reasonable extent,'" Corp. Techs., 943 F. Supp. 2d at 245 (quoting New England Tree Expert Co. v. Russell, 306 Mass. 504 (1940)); see Boulanger, 442 Mass. at 646. The public interest, therefore, also supports enforcing the Non-Solicitation Agreement into which Pilsbury entered with NEC.

## VI.     Conclusion

For these reasons, NEC's motion for preliminary injunction, D. 9, is ALLOWED. Pilsbury's motion for disclosure of categories of confidential information, D. 19, is DENIED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge